IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVEN GELTMAN,<br>**Plaintiff,**<br><br>v.<br><br>ALLCITY NETWORK, INC. and BSN LIVE, INC.,<br>**Defendants.** | CIVIL ACTION<br><br><br><br><br>NO.  24CV2255 |

## MEMORANDUM OPINION

Plaintiff Steven Geltman was employed by Defendant AllCity Network, Inc. ("AllCity") for just over 90 days before he was fired. Geltman sued AllCity and Defendant BSN Live, Inc. ("BSN")[1] alleging that his termination was due to his age, in violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. §§ 621, *et seq.*; the Pennsylvania Human Relations Act (the "PHRA"), 43 Pa. Cons. Stat. § 951, *et seq.*, and the Philadelphia Fair Practices Ordinance (the "PFPO"), Phila. Code § 9-1101, *et seq.* Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on all counts.

I.  **FACTUAL BACKGROUND**

In August of 2023, AllCity—a digital media company that produces podcasts and other sports-related media—began expanding into Philadelphia. As part of that expansion, Jonathan Riskin, AllCity's Vice President of Revenue based out of Denver, sought to hire a Director of Sales for the Philadelphia office. Riskin hired Geltman, a sixty-two-year-old man, as the new Director, making him responsible for overseeing a team of account executives and for meeting

---

[1] Although Geltman sued AllCity and BSN, BSN was the entity that eventually became AllCity; it no longer exists as a separate legal entity.

1

personal sales goals.

For the first month or so of his employment, Geltman did not have the tools necessary to develop the sales materials he needed to pitch prospective clients. As the Philadelphia office got up and running, Riskin and Park Sperry—AllCity's Director of Business Development out of the Denver office—developed and approved those materials, usually in the form of slide decks. By early or mid-October, Geltman had access to some (but not all) of the technology he needed to develop his own decks, but Riskin was not happy with his work. For example, Riskin criticized Geltman's work on a slide deck which contained "major omissions"—it used the wrong client's name throughout the deck, and failed to describe the kinds of services that AllCity was planning on pitching. Accordingly, Riskin asked Geltman to spend some time getting accustomed to the deck-building technology, PowerPoint.

Geltman, in turn, began sending all his draft materials to Sperry for touch-ups and to bring them in line with AllCity's standards. When Riskin caught wind that Geltman was still using Sperry to finalize his sales materials, he intervened, telling Geltman that it was his responsibility to develop his own materials, and that he must stop using Sperry to do so. Despite Geltman testifying during his deposition that he understood Riskin "loud and clear," the very next day, Geltman emailed Sperry to edit another of his decks. Sperry forwarded the request to Riskin, and Riskin wrote to Geltman, stating:

> Hey Steve—this is concerning. This is the exact opposite of what we discussed 10 hours ago. It is your job to build proposals for your prospects, not [Sperry's]. We've had multiple working sessions on this and you have all the materials available to you—you and your team need to be able to build decks and media plans without the bottleneck of coming back through Denver.

Two weeks later, Geltman reached out once more to Sperry, this time saying he was sick, and requesting that Sperry fix his deck for him. Sperry again forwarded the request to Riskin, and

2

Riskin again told Geltman that looping in Sperry on his sales materials was unacceptable. At some point in mid-November, Riskin told Geltman: "as it pertains to technology, because in the past you may not have had to have done it, but because of your age, I would like you to take a refresher course" on the technology necessary to build sales materials.

For his part, Geltman had issues with one of the account executive he supervised, one Christopher Bradley. He noted that Bradley was not making enough phone calls to pitch sales, never had any meetings with prospective clients, and was frequently out of the office (although Riskin purportedly approved his coming in late and leaving early so that he could drop off and pick up his kids from school). On the other hand, Bradley felt micromanaged by Geltman, in part because, upon his arrival at the Philadelphia office, Geltman asked for a list of Bradley's prospective clients, informed him that "he had a relationship with every account on the list," and took over communications with every client except those in the automotive industry, which Bradley felt was a slight. In part because of Bradley and Geltman's testy relationship, Geltman requested permission and was allowed to hire another account executive, Rick Zitkovic.

Geltman placed Bradley and Zitkovic in the same room, which he nicknamed "the pit." In Geltman's words, the pit was "very chill;" employees wore T-shirts and shorts, there was a ping-pong table, and the fridge was filled with both beer and soda. From Geltman's perspective, the pit was "a more loose environment than most," where the team would joke—sometimes crudely—with one another, and "the only thing off limits was your kids." Geltman testified that Zitkovic and Bradley would frequently call him "the old guy," "elderly," and "dinosaur." Sometimes, Geltman would make self-deprecating jokes about his age in an effort to fit in, but other times, Geltman would push back on the two's cajoling with a "shut the F up" or an "F you[.]" Geltman also testified during his deposition that other sales employees would sometimes

make comments about his age on calls with the sales teams from all of AllCity's markets, but could not identify anyone who had done so. And Geltman testified, too, that Bob Marino, an investor in AllCity, on at least two occasions, stated that "for an old guy, [Geltman] really underst[ood] the technology."

Riskin described Geltman's communication style as "frenetic" and "chaotic," testifying that the two were in constant communication—often speaking twice per day and on weekends over the phone, and with Geltman copying or blind copying Riskin on nearly all his emails to Bradley and Zitkovic. Those emails, Riskin testified, were a "rambling stream of consciousness, so [the reader was] always trying to decipher what's happening." And because Geltman "didn't create" a culture of "organized communication of what was happening in the sales department . . . there was a lot of misunderstanding around one particular deal that got people really worked up." In said deal, Geltman led initial sales conversations with an organization involved in the Philadelphia 76ers possible relocation to Center City Philadelphia. But AllCity leadership thought that getting involved with such a politically fraught issue would blow back on the team, and so Riskin suggested AllCity "pass on" the opportunity, "or at least . . . kind of hit pause on it." Nevertheless, Geltman attempted to move forward with the deal.

Bradley's resignation led Riskin to conclude that the Philadelphia office was "worse than [he'd] thought." As a result, Riskin spoke with Brandon Spano, AllCity's CEO, articulated his concerns about Geltman's performance, and requested permission to terminate Geltman. Spano approved, Geltman was fired in early December, and Riskin and Zitkovic took over most of Geltman's responsibilities until AllCity could hire a new Director of Sales. The new Director, hired almost a year later, was a 44-year-old woman.

## II. LEGAL STANDARDS

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Inferences to be drawn from the underlying facts contained in the evidential sources must be viewed in the light most favorable to the party opposing the motion." *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Id.* (citation omitted). A moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

## III. DISCUSSION

At the outset, although Geltman brought claims under the ADEA, PHRA, and PFPO, such claims are evaluated under identical rubrics, so they rise and fall together. *Higgins v. MetLife Inc.*, 687 F. Supp.3d 644, 649 (E.D. Pa. 2023) (collecting cases). To prevail on a

discriminatory termination claim, Geltman "must show that his . . . age 'actually motivated' and 'had a determinative influence on'" AllCity's "decision to fire him." *Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 (3d Cir. 2002) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000); *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). He can satisfy that "burden by (1) presenting direct evidence of discrimination . . . or (2) presenting indirect evidence of discrimination that satisfies the familiar three-step framework" of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* at 337-38 (citing *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108, 1113 (3d Cir. 1997) (en banc)).

Geltman argues that he has established both direct and indirect evidence; each argument will be addressed *seriatim*.

### A. Direct Evidence

To establish that his termination was age-motivated via direct evidence, Geltman must present evidence "sufficient . . . for a reasonable jury to conclude that age was the determinative, but-for cause of the employee's termination." *Palmer v. Britton Indus., Inc.*, 662 F. App'x 147, 151 (3d Cir. 2016) *amended by* 2025 WL 611370 (3d Cir. Feb. 26, 2025). In other words, direct "evidence must demonstrate '*without inference or presumption*' that age discrimination was the but-for cause of termination." *Id.* at 150 (quoting *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994)).

Geltman argues that Riskin's comment requesting he "take a refresher course" on certain technology, "because in the past [he] may not have had to have done it . . . because of [his] age" is direct evidence that Riskin terminated him due to him being sixty-two.[2] But that lone

---

[2] Geltman also argues that Riskin terminated two other AllCity employees (both younger than him) only after placing them on a Performance Improvement Plan, that he was never given such a probationary period, and that such facts are direct evidence that he was terminated because of his age. But evidence of an employer treating

6

comment, which "cited [Geltman's] age as a factor potentially contributing to his poor [technological] performance, . . . was at most evidence that age was a secondary factor in the decision to fire" him, and therefore is insufficient direct evidence to establish his age discrimination claim. *Palmer*, 662 F. App'x at 151 (determining that employer's comment that employee "might be 'too old to change industries'" six days before employee was terminated was not direct evidence sufficient to establish age discrimination). Further, "[d]irect evidence does not include stray remarks that are made in a context unrelated to the employment decision, particularly if, they are remote in time," such as Riskin's comment weeks before he terminated Geltman. *Garcia v. Newtown Twp.*, 483 F. App'x 697, 704 (3d Cir. 2012); *see also Fuentes v. Perskie*, 32 F.3d 759, 767 (3d Cir. 1994) ("'Stray remarks . . . by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.'" (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992))); *Starnes v. ThredUP Inc.*, 2023 WL 4471673, at *6 (E.D. Pa. Jul. 10, 2023) (collecting cases).

Undeterred, Geltman cites two cases that, in his view, demonstrate that Riskin's comment is sufficient to establish direct evidence of discrimination. The first is an unpublished non-precedential opinion from the Western District of Pennsylvania, *Pepke v. Manor House Kitchens, Inc.*, 2024 WL 4008237 (W.D. Pa. Aug. 30, 2024). But in *Pepke*, the employer made numerous comments about the employee's age, and one such comment—that the employee was "over 60 years old" and that "the younger employees [were] the future of the company"—

---

similarly situated comparators differently than the plaintiff is the paradigmatic *indirect* evidence that might raise the inference of discrimination under the *McDonnell Douglas* framework; similarly situated, differently treated comparators are not direct evidence of discrimination. *See, e.g.*, *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645-47 (3d Cir. 1998) (evaluating comparator evidence under the *McDonnell Douglas* framework); *Greenawalt v. Clarion Cnty.*, 459 F. App'x 165, 168-69 (3d Cir. 2012) (same). As such, Geltman's arguments about comparators will be addressed below, under the *McDonnell Douglas* framework, where such arguments are at home.

occurred during the very meeting at which the employee was terminated. *Id.* at *2 (internal quotation marks omitted). Because the comment "'unambiguously'" revealed that the employer "'viewed'" the employee "'as a less desirable employee because of his age,'" the district court denied summary judgment. *Id.* (quoting *Fakete*, 308 F.3d at 339-40). Here, Geltman has failed to produce evidence of any such age-related comments at the time of his termination, so *Pepke* is no help to him.

Next, Geltman points to another district court case—this one out of circuits, *Marlow v. Chesterfield Cnty. Sch. Bd.*, 749 F. Supp.2d 417 (E.D. Va. 2010), for the proposition that "[c]ourts have found that a 'technological bias' can be linked to age discrimination," and so therefore, Riskin's technology related comment is enough to support his claim. In *Marlow*, the superintendent of the defendant-school district commented that he wanted to prioritize "21st Century skills" in staffing the school district. The superintendent thought the plaintiff did not possess such skills, and, as a result, offered the plaintiff a demotion over another teacher who he believed had more of such skills than the plaintiff. *Id.* at 424-25. Additionally, the superintendent gave a presentation impliedly tying age to technological skill. *Id.* at 426. The court determined that the superintendent's lone comment about "21st Century skills" could *not* establish direct evidence, but nevertheless determined that because the presentation "suggest[ed] several indicia that '21st Century skills' correlate[d] with age," and because only the "most senior and oldest" teachers "were eliminated based on their relative lack of 'technology skills,'" it was therefore "arguable" that the plaintiff had established "sufficient" *circumstantial* evidence to support a discrimination claim, even without evaluating said claim through the *McDonnell Douglas* framework, under Fourth Circuit law. *Id.* at 428. In other words, even if *Marlow* was precedential in the Eastern District of Pennsylvania (which it is not), *Marlow* explicitly rejected

8

the proposition that a lone comment about technology and age—which is all Geltman relies on—could be direct evidence of discrimination. *Id.*

Considering the foregoing, Geltman has failed to establish his discrimination claim through direct evidence.[3]

### B. Indirect Evidence

If, as here, a plaintiff-employee fails to provide direct evidence of age discrimination, they may still be able to establish a discrimination claim if they can satisfy the burden-shifting framework established by *McDonnell Douglas*. Under that framework, the plaintiff bears the initial burden of establishing the *prima facie* case. *Keller*, 130 F.3d at 1108. If the plaintiff does so, the burden shifts to the defendant, who must offer "a legitimate, nondiscriminatory reason for the discharge." *Id.* If the defendant meets that burden, then "the burden . . . rebounds to the plaintiff, who must show by a preponderance of the evidence that the employer's explanation" for terminating them "is pretextual." *Fuentes*, 32 F.3d at 764.

#### i. Prima Facie *Case*

To establish his *prima facie* case, Geltman "must show that (1) he is at least forty, (2) he is qualified for the job, (3) he suffered an adverse employment action, and (4) he was replaced by

---

[3] Geltman briefly references a "cat's paw" theory: an argument that because Bradley, his subordinate (not supervisor) harbored some age-discriminatory animus (in Geltman's view, revealed by his age-related needling), and because Bradley influenced Riskin's decision to terminate Geltman, Riskin's decision to do so was tainted by Bradley's discriminatory animus. In order to establish a "cat's paw" theory, Geltman would have to "establish" that Bradley: "(1) performed an act motivated by discriminatory animus; (2) the act was intended by [Bradley] to cause an adverse employment action; (3) that act is a proximate cause of the ultimate employment action; and either (a) defendants acted negligently by allowing [Bradley's] acts to achieve their desired though they knew (or reasonably should have known) of the discriminatory motivation; or (b) [Bradley] was aided in accomplishing the adverse employment action by the existence of the agency relation." *Burlington v. News Corp.*, 55 F. Supp.3d 723, 738-39 (E.D. Pa. 2014) (internal citations omitted). Here, Geltman has failed to produce any evidence that Bradley "performed an act motivated by discriminatory animus," unlike the plaintiff's coworker in *Burlington*, who encouraged her colleagues to complain to management about the plaintiff. *See id.* at 739. To the extent that Geltman relies on Bradley's and Marino's comments about his age to establish his cat's paw theory, such comments—made by individuals who had no power to terminate him—are insubstantial here. *Ezold*, 983 F.2d at 545; *Starnes*, 2023 WL 4471673, at *7 (collecting cases).

9

(or passed over in favor of) someone else 'who was sufficiently younger so as to support an inference of a discriminatory motive.'" *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015)). [4] For purposes of its Motion for Summary Judgment, AllCity does not dispute elements one through three; only the fourth is at play.

In its briefing, AllCity argues that while Zitkovic and Riskin absorbed Geltman's duties when he was terminated, they did not replace them[5]: Neither did the forty-year-old woman who was hired about a year after he was fired. But it does not cite to any caselaw in support of either argument, so such arguments must be rejected as unsupported. *See* E.D. Pa. R. Civ. 7.1(c) ("Every motion certified as uncontested . . . shall be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion."); *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion . . . will be deemed waived." (citation omitted)).

### ii.   *Legitimate Nondiscriminatory Reason*

Because Geltman has established his *prima facie* case, the burden now shifts to AllCity, where it must "articulate some legitimate, nondiscriminatory reason" for terminating him. *McDonnell Douglas*, 411 U.S. at 802. AllCity points to evidence that Geltman was terminated due to his poor communication skills, management style, lack of technological capability, and

---

[4] In the parties' view, the fourth element of Geltman's *prima facie* case is that he was terminated "because of [his] age," *Fowler v. AT&T, Inc.*, 19 F.4th 292, 299 (3d Cir. 2021) (citing *Willis*, 808 F.3d at 644), rather than that he was replaced by someone younger than him. But the parties' formulation of the fourth element is only appropriate in cases where it is undisputed that "the plaintiff [was] not directly replaced," such as when the plaintiff's position is eliminated entirely. *Willis*, 808 F.3d at 644 (quoting *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999)). This is not such a case.

[5] Even so, there is conflicting evidence in the record about just how much of Geltman's work Zitkovic absorbed after his termination.

10

low sales numbers which they maintain are legitimate, non-discriminatory reasons. While Geltman does not dispute that such reasons for firing him are legitimate and non-discriminatory; he does contend they are pretextual.

### iii.     Pretext

To make a showing of pretext, Geltman "must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2017) (quoting *Fuentes*, 32 F.3d at 764). In other words, Geltman "may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 764. In seeking to discredit AllCity's proffered reasons for terminating him, Geltman "cannot simply show that [AllCity's] decision was wrong or mistaken," but rather must show that said reasons were a pretext for invidious discrimination. *Id.* at 765. This burden is carried by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder *could* rationally find them unworthy of credence." *Id.* (internal quotation marks and citation omitted).

Geltman has not met his burden to show pretext; the record evidence he points to is insufficient as a matter of law. First, Geltman points again to the fact that Zitkovic took over some of his job duties after his termination, but although "[t]his fact helps establish a prima facie case of age discrimination . . . , without more, it does not demonstrate that [AllCity's] decision to

11

terminate [Geltman] for poor performance was pretextual." *Farzan v. Vanguard Grp., Inc.*, 582 F. App'x 105, 108-09 (3d Cir. 2014) (citing *Thomas v. Corwin*, 483 F.3d 516, 529 (8th Cir. 2007)).

Next, Geltman points to two younger employees who were fired from AllCity only after being placed on a Performance Improvement Plan ("PIP"). In his view, because Riskin terminated him without the benefit of a PIP, Riskin treated him differently than his younger colleagues, proving pretext. Geltman is not wrong that a plaintiff may establish pretext by proving that "the defendant has treated similarly situated, substantially younger individuals more favorably." *Willis*, 808 F.3d at 645. But said comparators must be just that: they must be differently treated and similarly situated "in 'all relevant respects.'" *Byrd v. Phila. Gas Works*, 2021 WL 5867881, at *7 (E.D. Pa. Dec. 10, 2021) (quoting *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011)). The employees that Geltman references are neither; although they were given the benefit of a PIP, they were both subject to the same adverse employment action as Geltman—they were both eventually terminated. And it is not disputed that the two employees Geltman points to were not director-level employees, but rather account executives. Finally, even if Geltman's proffered comparators' difference-in-title did not render them insufficiently similar to him, Geltman has adduced no evidence establishing said employees' job duties, and making the connection that they shared similar duties to him. As such, Geltman cannot rely on their PIP-prefaced termination to establish pretext. *Cf. Willis*, 808 F.3d at 646 (affirming summary judgment when plaintiff failed to identify "similarly situated, substantially younger employees experiencing similar difficulties" who did "not receiv[e] discipline.").[6]

---

[6] Geltman points to some evidence that, in his view, casts doubt on two of AllCity's reasons for terminating him. To Geltman, Zitkovic's deposition testimony that he was not a micromanager means that AllCity's reference to his leadership style must be pretext. Additionally, Geltman takes issue with the assertion that AllCity fired him for not

An appropriate order follows.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

_____

**WENDY BEETLESTONE, J.**

---

meeting his sales goals, because of certain conflicting testimony about whether AllCity maintained hard sales minimums at all by the time he was fired. Assuming, without deciding, that such disputes are genuine and resolving them in his favor, Geltman "cannot simply show that the employer's decision was wrong or mistaken," he must instead show that said reasons were a pretext for invidious discrimination. *Fuentes*, 32 F.3d at 765.